The next case is case number 4-17-0792, consolidated with 4-17-0793, Graham Utter v. Danny Utter and the statement Frank Utter. And appearing for the appellant is attorney Dustin Clark and for the appellee is attorney Ryan Byers. Good afternoon, gentlemen. Good afternoon. Mr. Clark, are you ready to proceed? May it please the court. Good afternoon. My name is Dustin Clark. I represent the defendant and appellant, Danny Utter, in his individual capacity, not in his capacity as executor of the estate of Frank Utter. I'd like to primarily focus upon, I believe, the biggest ask of the court today, which is asking the court to extend or to find that there is a qualified privilege for an agent acting under a power of attorney for property to be qualifiably privileged to interfere in the principal's contract. As I pointed out in my brief and appellee pointed out in their brief, Illinois courts have not granted or really considered such a qualified privilege in this context. The only case that I found that dealt with this issue was Reagan v. Garfield. In that case, they did not get to the issue. The argument was raised. However, in that case, the defendant had essentially entered into the contract in order to breach it and to interfere with it and also entered into the power of attorney relationship. And it all occurred contemporaneously. The court found that because the actions were so clearly unjustified, they didn't need to get to the question of whether or not an individual acting as an agent under a power of attorney should be extended a qualified privilege to interfere with the contract. However, I do think that there is good public policy reasons. I think there is statutory support to support the position that an agent acting under a property power of attorney should be entitled to a qualified privilege to interfere in the principal's contract. Principally, I point out the statement second of torts, which is favorably cited in Santucci v. Baxter, in which it essentially states that any kind of agency relationship, as long as the courts find that the importance of that agency relationship outweigh the importance of the contracting party's relationship, that a qualified privilege should extend to the principal. And they state that as a general statement of law. As I pointed out in the brief, I believe that 755 ILCS 45-2-7 gives, essentially directs the court to find a qualified privilege or at least points the court in the direction of finding a qualified privilege in this context. The statute that I just cited essentially limits the liability of agents acting under a power of attorney for errors of judgment, assuming that they act with due care and good faith. This is almost identical to the business judgment rule in the corporate context. And in the corporate context, directors and officers, because of the business judgment rule and because courts don't want to interfere in the exercise of business judgments, that may result in contracts being interfered with that are entered into with the corporation. The courts have found that that interference should be entitled to a qualified privilege. Similarly here, as I stated, the statute from the Power of Attorney Act is essentially identical and really the public policy reasons to find a qualified privilege are actually stronger in this context. In the context of a corporate director or officer acting under the business judgment rule, there is quite a bit of oversight on their decision making. There is the other board members, the shareholders, if they want any information, if it's a public company, public records, agencies that overview their decision making, the list goes on and on and on. And they're of course entitled to that privilege. Here, we don't have that same type of oversight. Nonetheless, the legislature has extended the same or very similar type of limitation of liability to agents acting under the Power of Attorney for their principal. If an agent acts under that and four days later, the principal essentially revokes what the agent has done and renews the lease, which is what happens here, what should the agent then do? Should the agent act on what they did or should the agent act on what it is apparent, absent testimony, it is apparent that the principal wants this done in the opposite way that the agent wants it done? Yeah, I definitely understand the Justice's point there. However, I do think it's important to look at the additional testimony because it does... Well, I mean, I'm not thinking about the dead man's testimony part. Sure. But considering what else is present. Right. I would say in that circumstance, absent some other evidence that the principal... Prevails. The principal should prevail in that circumstance. Well, what is the other testimony? Well, the other testimony, some of it did come in. Not all of it was kept out. There was testimony that Frank Utter and Danny Utter were both present with Randy Bauer. Now, there wasn't direct testimony, this is what Frank wanted, but there was testimony that they were all discussing this together when both of the notices to quit were issued. And Danny was acting pursuant to counsel's advice. Was it possibly incorrect if there was a valid contract? I think that's likely. The valid contract would have controlled the terms of when the lease could be terminated rather than the statute, which typically controls oral leases. What difference does it make if that's what happened when the notice to quit, if four days later Frank says, no, you're going to go ahead and do it for this next year? Yeah, I would completely agree. If that was all of the facts that were present, I would agree. Well, tell me what the most important facts are that are present in the record without addressing the dead man's issue. Sure. I think the most important facts that are present as it relates to that issue are a couple. One is the authority that was granted to Danny Utter to make gifts to himself, which I hope to get into later as to why that should extend. But should a gift to himself revoke that which the principal has already done? Or is that more akin to I'm going to make a gift of some of the rents to me? Right. I see your point. It would be different, I believe, in a different context. The other, and I believe more important fact, is the fact that Randy Bauer and Frank Utter and Danny Utter acted in concert. Absent that, given that there is the dead man act issue and some of the testimony wouldn't have been able to come in. But I want to understand again, acting in concert was done before Frank signed the new lease. Is that correct? It was done both before and after, I believe. All right. I'm sorry. You go on with your argument. I apologize, Your Honor. Let me interrupt you before you get to where you were at. I'm sorry. But as to qualified privilege, Mr. Byers has argued that that issue is forfeited because it wasn't raised in the trial court. Do you agree that qualified privilege was something that had to be applied as an affirmative defense in the trial court? I think typically under the holding in Roy v. Coyne, that sets out essentially a framework, and I think a sensible framework as to who has the burden to actually plead the case. I suppose the short answer is no, I don't think that that should be applied rigidly in this case. In this case, the petitioner was actually put on notice in a number of different ways, and that is at the heart of 2613D, which controls when affirmative defenses need to be raised. But a qualified privilege isn't an absolute privilege if there is unjustified or malicious conduct that accompanies that that can defeat the qualified privilege, right? Correct, Your Honor. So doesn't that then mean that it has to be raised in the trial court? How can we address this now for the first time on appeal? I don't actually believe it is being raised for the first time for two reasons. One, the petition itself actually does raise both facts and a conclusion of law that Danny Utter's actions were unjustified. That is essentially what is required of the affirmative in most circumstances where the privilege is not obvious, which I think it's fair to say it's not obvious here. We have a situation where there's no established law on the issue of a qualified privilege for an agent acting here. But here, the petition actually stated that his actions were unjustified. So a simple denial of that allegation is enough to put all the parties on notice as to this issue of justification versus lack of justification. And again, misunderstanding, as you say, the petition. It's an affirmative defense, so it would have to be raised in the answer through a separately-fled affirmative defense, right? Typically, yes, Your Honor. I agree with that is what Roy V. Coyne has held. What I'm arguing is the heart of requiring it to be an affirmative defense as opposed to requiring the petitioner to raise it in some circumstances all comes down to placing all the parties on adequate notice as to what the issues are going to be. My point is here, the petition itself raised the issue. They didn't have to. They didn't have to plead facts that Danny Utter's actions were unjustified, but they in fact did. So a simple denial of those allegations, I think, is enough to effectively do the same thing that an affirmative defense would have done. If the Court is following me, I apologize if it's not. It's an interesting argument. Do you have any case law to support that? Your Honor, I do to a certain degree. In re the marriage of Sassano, which I cited in the reply brief, in that case the defendant had not raised the affirmative defense of fraud, but was still allowed to present evidence on fraud and the issue was not waived for purposes of appeal because the other side was put on sufficient notice from both motions made prior to trial and also because of the evidence that was supplied at trial. The appellate court found in that case that the heart of the affirmative defense requirement is placing everybody on notice about what the issues are going to be. I think we have a similar circumstance here, both for the argument I've just outlined, as well as there was a motion to dismiss or strike, which raised, I admit it did not use the language of a qualified privilege, but it did state that the claims against Danny Utter personally should be struck or dismissed because the section of the Power of Attorney Act, which limits an agent's liability when they're acting for judgment they use, there was a claim that that code section or that statute section exempted Danny Utter from liability in this case. I think that is essentially the heart of the qualified privilege argument. Was it briefed thoroughly or did it use the precise language? No, of course not. But they did argue effectively the same thing, that at the heart of the agency-principal relationship, the limitation on liability is derived from the statute section. And given that in these circumstances there should not be liability as a matter of law, the matter should be dismissed. The trial attorney also raised the argument in his closing argument, the exact same argument. So I don't think that the appellee was at any kind of disadvantage and the issue should be considered on appeal. The appellee also raised the issue of the presumption of fraud, and I promised the Court that I would get back to that issue. The Court, I'm sure, since this Court is the one who decided it, is familiar with Collins v. I apologize, I believe it's Notensmeyer, which was recently decided in this Court. Essentially in that case, the Court found that there should not be a, I'm sorry, the lady in that case who was appointed as the agent assigned benefits, I believe under a life insurance policy, to herself and justified that based on language in the power of attorney document itself, which allowed her to change beneficiaries writ large. This Court found that because it didn't specifically grant her the authority to grant it to herself, that language in the power of attorney was insufficient to grant her the authority to grant that benefit to herself. In this case, there was a similar provision, except the provision actually permitted Danny Utter to make gifts to himself. Now a gift, as the appellee pointed out, is not the same thing as a business contract. I admit that, but it does, I believe, or should still result in Danny Utter's, I'm sorry, presumption of fraud not arising here, because I believe it would lead to an absurd result. Essentially, if Danny Utter had simply conveyed that land to himself and all of the attendant contracts, he wouldn't have been liable for tort, and he certainly wouldn't have had a presumption of fraud attached to him. But that seems silly, that that wouldn't come with a presumption of fraud. But at the same time, when he's acting in concert with an attorney, with his father, that raises a presumption of fraud because the precise language of the power of attorney didn't anticipate business transactions with himself. It does permit business transactions to be conducted on behalf of the principal. It just doesn't include the language of with himself or that benefit the agent or successor agents. And even if the presumption of fraud did apply here, I don't think there's enough from the lower court to conclude that they actually made a ruling, and I believe this court can make a ruling on the record as it is that the presumption was actually overcome. Out of Spring Valley Nursing v. Allen, there's a series of factors that are considered when determining if the presumption of fraud has been overcome. And two of the primary considerations that the court is to look at is whether or not the agent acted with independent legal advice and whether the principal was made fully aware of the decision-making process. And I think both of those facts exist here. So even if the language under the power of attorney is not sufficient to put aside the presumption of fraud that occurs when an agent self-deals, I think that the record as it stands is enough for this court to find that that presumption was overcome. Your Honor, I would ask that the court consider extending a qualified privilege to an agent acting under a power of attorney and would, in fact, extend such a privilege and find that the ruling in this case should be overturned. I won't be addressing the other two issues that I raised in my briefing. I believe those can stand on their own, and I thank the court for its time. Okay. Thank you. Mr. Byers. Yes, Your Honor. May it please the court, counsel, my name is Ryan Byers, and I represent the plaintiff appellee in this case, Mr. Graham Utter. As with Mr. Clark's argument, I would like to primarily address the issue of qualified privilege that has been raised. Mr. Clark and I do certainly agree that this privilege has not been recognized within the state of Illinois previously, and from the research that I did, I was unable to locate any state that had recognized this privilege in this specific context as of yet. This is an important legal issue that this court should consider. Now, one of the things that Mr. Clark focused on quite heavily both in his briefing and in his argument today was an analogy to the business judgment rule in terms of the privilege that he's seeking. And he indicated that it's his position that the business judgment rule is in many ways analogous to the Power of Attorney Act's provisions regarding liability found in Section 2-7 of that Power of Attorney Act, specifically subparagraph A. However, I believe that analogy fails. The language in the Power of Attorney Act and the business judgment rule are separate and distinct legal principles that ought not to be analogized to one another. Unlike the language of the Power of Attorney Act, the business judgment rule is a presumption of good faith. The Power of Attorney Act language does not create such a presumption. Instead, the Power of Attorney Act language limits liabilities in situations where agents act with due care. Whereas the business judgment rule says that good faith is presumed, the language under the Power of Attorney Act, Section 2-7, says that liability for certain acts will be negated if good faith is established. I think that can be seen if we look at some of the language of 2-7, subparagraph A, that the appellant did not reference in either their brief or their argument today. If we look at 2-7, subparagraph A, and we look at it as a whole, as the cherry picking its provisions, there is language that says that there will be the imposition of liability upon an agent in circumstances where that agent acts negligently. And then there are some limited exceptions to that liability for negligent action. So this statute, instead of being a presumption of good faith and fair dealing as the business judgment rule is, appears instead to have a primary purpose of imposing liability upon an individual, and it can therefore hardly be said to be the basis for a new privilege that would eliminate significant liability for those agents who potentially interfere with the contracts of their principles. Even if a privilege is found to exist, it should not apply to the defendant in this case because he engaged in impermissible self-dealing. And it should be noted that even if we're talking about the business judgment rule that the appellant tries to make an analogy to, there is quite a bit of law which indicates that the business judgment rule protections vanish once evidence countering the presumption of good faith is introduced. And similarly, as was mentioned by Mr. Clark, the court in Reagan v. Garfield Ridge Trust and Savings Bank did examine briefly the issue of this privilege, and they ultimately didn't reach that question on its merits because they felt that the agent acting in that case had engaged in self-dealing. Here the evidence in the record before this court shows that the defendant engaged in self-dealing as well. The defendant testified that he was going to begin farming Frank Utter's land after he had the plaintiff removed from it. That included an admission from the comment from the Schuyler County Sheriff who was called to testify that the defendant told him that he was going to quote-unquote take over Frank Utter's farm immediately before the defendant requested that the plaintiff be arrested and removed from the property. And that comment appears in the record at R-124. From the court's ruling and from the exhibit that was introduced, it was Plaintiff's Exhibit 6 at trial, we know that this farming operation was or at the very least could be a profitable farming operation. So what the defendant was doing was attempting to secure the benefits of that profitable farming operation for himself. Now as the court is well aware, when an agent under a power of attorney engages in self-dealing, a presumption of fraud will arise. In many cases such as the state of transaction that he entered into is a gift to himself. And we cannot deny the fact that the power of attorney that was executed does allow for the giving of gifts including to the agent. However, the presumption of fraud that exists from self-dealing can only be overcome by clear and convincing evidence, which is stated in the Spring Valley v. Allen case that Mr. Clark referenced earlier. Now this clear and convincing evidence has been held to include, for example, gifts that are consistent with the principal's past practice. There was no evidence presented in the court below that anything that the defendant did with Frank Utter's land was consistent with any past practice. That past practice holding we can find in In Re. Guardianship of Spinney, citation in the briefs. Now in his reply brief for the first time and again today, Mr. Clark raised the issue of the We have both read the Collins case, but we appear to have different interpretations of it. Now in this case, as Mr. Clark stated, an agent was not allowed to change a beneficiary designation so that she herself would be the beneficiary even though the power of attorney did give her the ability to change such is that in order for a power of attorney to authorize an agent to engage in self-dealing, that power of attorney needs to be very clear and very specific about the authorization of the self-dealing. It wasn't enough that the Collins power of attorney said that you could change the beneficiary. This court essentially said that the power of attorney needed to say in order for that to be lawful, you can change the beneficiary to yourself. So if we're dealing with very specific language that has to be present in the power of attorney to authorize that self-dealing, we would submit that in order for the defendant to do what he did in leasing Frank Utter's land to himself, there ought to have been language in that power of attorney expressly stating as much. In terms of the power of attorney that was executed here, did it follow the statutory power of attorney, the short form power? My understanding, your honor, is that it is the statutory form that was on the books at the time. I believe that they have changed since then. What was the date of the power of attorney? My recollection offhand is that it was 2012, though I can double check that in my notes very quickly. Yes, the power of attorney was executed on February 21st of 2012.  Thank you. Thank you. There was also some suggestion by counsel that the self-dealing by Danny Utter ought to be allowed because there was essentially coordination and consultation between the defendant, Danny Utter, the decedent, Frank Utter, and the attorney, Randall Bauer. I suppose it is possible that I missed that testimony somewhere along the way, but the testimony from Mr. Bauer that I did make note of, and I would bring that to your honor's attention, is in the record at R134 in which he indicated that he spoke with Frank or Danny. And unless there is something I missed, I do not believe that there is a clear indication that he ever spoke with both of those individuals. In light of this and all of the foregoing, we do not believe there is a reasonable basis for creating this qualified privilege that is urged by the defendant. And even if that were a privilege that the court were inclined to create, we believe that the self-dealing would defeat that claim of privilege. The calculation of damages. Yes. Did your client actually farm that ground in the fall of 2013 and the spring of 2014? He had farmed the land for 10 to 12 years before the issues that gave rise to this case. And he had completed farming the land, I believe, for the 2013 to 2014 crop year. And when we say crop year, the definition that was given of crop year by my client in his testimony was, I believe, March 1 of 2013 through February 28 of 2014. And then he went back and he attempted to, after he entered into the written lease, he went back and he did do some planting for the next season. And that is when he was arrested and removed from the property. So all of the calculation of damages is based on estimates? That's correct. Now, in regard to all the issues that are present, why aren't all of those resolved by the fact that Frank entered into the contract after the first notice to quit was sent? By that I mean, why isn't that dispositive? I believe that that is dispositive. This is a situation in which there was an oral lease between the parties for 2013 to 2014. Danny Utter sent a notice to quit telling Graham Utter, you need to be out for that lease period by February 28 of 2014 and you're done after that. Subsequent to that, as your Honor has indicated, both to myself and Mr. Clark now, subsequent to that, there was the written lease that was entered into between Frank Utter and Graham Utter. And that lease and its terms are very clear that if there is any attempt to terminate that lease, then possession will not be given up until the end of the then current term. Subsequent to that written lease being entered into, there was another notice to quit served. But that notice to quit, again, referenced the February 28, 2014 date, as opposed to anything associated with the 2014 to 2015 lease. So our position, which we believe is the position that the court reached, is exactly the position that your Honor articulated, is the fact that it's that written lease for 2014-2015 that controlled. And when Danny Utter had Graham Utter arrested and hold off that property while he was attempting to carry out the terms of that lease, that was tortious interference with that written lease. Had the prior leases all been oral? The prior leases had all been oral, yes. And the majority of them had been crop share leases until the year before the written lease, where there was one oral cash rent lease, and the written lease was a cash rent lease as well. If there are no further questions, we would simply ask at this time that the court uphold the ruling of the trial court in all respects. Thank you for your time. Thank you. Mr. Clark, rebuttal argument? First, I'd like to address Justice's next point as to whether or not the subsequent lease is dispositive to the issues before the court today, and I don't believe they are. Arguably, it would be dispositive to the issue of whether or not the estate of Frank Utter is liable to Graham Utter for breach of contract, but it is not dispositive to the issue of whether or not Danny Utter is liable under the theory of tortious interference with the contract. In simple terms, without using legal terminology, you concede that maybe what your client did was not the right thing to do in the circumstances, but he had a qualified privilege to do it. Thus, he shouldn't be liable for this kind of claim. I think that I wouldn't be willing to go so far as to say he shouldn't have done what he did. I think he would take the position that he was trying to act on behalf of his father. Right. But did he act in a way that is – did he, in a sense, cause a breach of a contract? I think that's clear. He did, in fact, cause a breach of a contract. I think that was established at the trial level. But he is, as agent, under a duty of care, correct? Correct. And that's my point. He may not have acted perfectly, but we're not asking that the court find that he acted perfectly, but rather he acted in such a way that is not unjustified. I would distinguish this set of circumstances from the Reagan case where the individual got involved for the purpose of breaching that contract or inducing a breach of that contract. Whereas here, Danny Utter was appointed as Frank Utter's agent under a power of attorney two years before this whole incident occurred. So I don't think that the facts are similar here. Your Honor, I'm sorry, Justice had also asked about additional evidence, and Mr. Beyer mentioned testimony of Randall Bauer. And I direct the Court's attention to the record of 133 where Attorney Bauer testified that he believed that Frank Utter wanted to terminate his business relationship with Graham Utter. That particular testimony was not objected to by the plaintiff. In addition, Attorney Bauer testified in a letter that was provided, that was sent to Graham Utter, that indicated that the notices to quit were valid and that the property was leased to somebody else, namely Danny Utter. And finally, the Attorney Bauer communicated to Graham Utter over a phone conversation that he represented both Frank Utter and Danny Utter. Thank you, Your Honors. I appreciate you hearing me out. Thank you. Thank you, Counsel. Thank you both. The case will be taken under advisement and a written decision shall issue. The Court stands to reschedule.